## NORTHERN MONTANA MUSTARD GROWERS CO-OPER-ATIVE, a Corporation, Plaintiff and Respondent v., MAU-RICE BRITTON, Defendant and Appellant.

No. 9275.
Submitted November 10, 1954. Decided March 7, 1955.
280 Pac. (2d) 1078.

554

Messrs. Swanberg & Swanberg, Great Falls, Mr. John W. Bonner, Helena, for appellant.

Messrs. Doyle & Francisco, Conrad, for respondent.

Mr. Stephen M. Swanberg and Mr. D. W. Doyle argued orally.

MR CHIEF JUSTICE ADAIR:

This is an appeal by the defendant Maurice Britton from a judgment for the plaintiff, Northern Montana Mustard Growers Co-Operative, a corporation, entered on a directed verdict.

Plaintiff is a public warehouseman doing business at Conrad, Montana. Defendant is a farmer residing at Brady, Montana, situate about 12 miles distant.

By complaint filed September 5, 1951, plaintiff seeks to recover specified sums of money advanced upon delivery to it by defendant of various quantities of mustard seed produced on defendant's farm.

*Warehouse Receipts.* Upon the delivery to it of the mustard seed the plaintiff gave defendant three separate public warehouse receipts, being plaintiff's exhibits 4, 5 and 6, all admitted in evidence without objection. Exhibit 4 reads:

"Northern Mont. Mustard Growers Co-op      No. 10401

"Conrad, Montana, 10/2/1946

"Operated as a public warehouse under license issued by the department of agriculture, labor and industry of the state of Mont.

"Received in store from Maurice B. Britton, Brady, Montana, No. 2 yellow *grain*. Encumbrances as follows: Issued in lieu of 10167, 10172, 10174. Subject to an account of $4900.00 advance, $360.00 account for cash or merchandise we have furnished or become responsible for. Unless otherwise indicated on the face hereof, the *grain* mentioned in this receipt has been stored with *grain* of the same grade, kind and quality (as provided for under the U. S. Federal Grain Standard Act, 7 U. S. C. A. sec. 71 et seq.) Upon the return of this receipt properly endorsed by the person to whose order it was issued and the payment of the proper charges for storing and handling, delivery will be made in accordance with the provisions on the back of this ticket. This *grain* is insured for the benefit of the owner.

Gross Lbs.   39440   "Northern Mont. Mustard Growers Co-op
Tare          15410
Net. Lbs.     24030
Dockage      1200
Net Lbs.     22830   "By Dorothy Bishop /s/ Agent"

Exhibits 5 and 6 were for 7395 and 7620 pounds respectively. Otherwise they were the same as exhibit 4 above quoted.

*Complaint.* The complaint sets forth three separately stated causes of action.

The first cause was for $360 for certain goods, wares and merchandise sold by plaintiff to defendant between September 28, 1946, and June 7, 1947.

The second cause of action alleges that defendant delivered to plaintiff for storage yellow mustard seed as follows:

"On October 2, 1946 .................................................. 22,830 lbs.
"On January 17, 1947 .............................................. 7,395 lbs.
"On January 28, 1947 ............................................ 7,620 lbs."

and is for advances made by plaintiff to defendant on such seed as follows: "On October 3, 1946, the sum of $2,000.00. On November 9, 1946, the sum of $1,000.00. On December 16, 1946, the

sum of $500. On January 17, 1947, the sum of $1,200.00, which sums the defendant promised and agreed to repay to the plaintiff.''

The second cause of action further alleges that on June 17, 1950, plaintiff demanded storage charges and such advances, together with interest thereon, which on August 7, 1950, amounted to a total of $6,107.89; that in partial satisfaction thereof plaintiff on August 7, 1950, sold such mustard seed at public sale for $2,649.50, leaving a claimed unpaid balance of $3,460.74, for which plaintiff demanded judgment against defendant.

The third cause of action was for the sum of $200 alleged to have been advanced and lent September 7, 1946 by plaintiff to defendant and for interest on such amount.

*Answer.* In his answer defendant admits the allegations of the first cause of action except he specifically denies that plaintiff has ever demanded payment of the $360 claimed.

In his answer to the second cause of action defendant admits that plaintiff stored the mustard seed in question until August 7, 1950, when it was sold at public auction but denies the allegations of paragraph 4 thereof reading: ''That such storage was of the reasonable value of $362.90, at the rate of two cents (2¢) per bushel per hundred pounds per month and which the defendant promised and agreed to pay therefore.''

The answer admits that while said mustard seed was in plaintiff's elevator plaintiff advanced to defendant the sums of money specified in the complaint.

The answer denies the allegations of the complaint wherein plaintiff alleges: ''That on June 17, 1950, the plaintiff demanded payment for said storage charges and for such advances together with the interest thereon but the defendant failed and refused to pay the same or any part thereof and on August 7, 1950, there was due, owing and unpaid thereon from the defendant to the plaintiff the sum of $6,107.89 and on said date the plaintiff sold said mustard seed at public sale for the sum of $2,649.50 in partial satisfaction of the amounts due to the plaintiff for such storage, advances and interest thereon,

which sum was applied as follows, to-wit: First to the payment of said storage charges and the interest thereon amounting in all to the sum of $365.90, next to the payment of interest on said advances and loans amounting to the sum of $1,044.99 and the balance thereof to-wit: the sum of $1,239.26 to the payment of the principal amount of said loans and advances, leaving a balance as of August 7, 1950, on said advances and loans in the sum of $3,460.74 and that there is now due, owing and unpaid from the defendant thereon the said sum of $3,460.74, together with interest thereon at the rate of six per cent per annum from August 7, 1950.''

The answer admits the allegations of the third cause of action reading: ''That on September 7, 1946, at the special instance and request of the above named defendant the plaintiff advanced and loaned to the defendant the sum of $200.00, which the defendant promised and agreed to repay within a reasonable time and that on June 17, 1950, the plaintiff demanded payment thereof with the interest thereon but that the defendant has failed and refused to pay the same or any part thereof and that there is now due, owing and unpaid thereon from the defendant to the plaintiff the sum of $200.00 together with interest thereon at the rate of six per cent per annum from June 17, 1950.''

Defendant's answer ''denies that said money was loaned to him, and alleges the fact to be that said money was advanced on the security of said mustard seed only with the express understanding that if the market value of said mustard seed ever reached the total equaling the cash value of such advances that the same was to be promptly sold and defendant alleges that he never promised and agreed to pay the plaintiff anything on account' of any of such advances made to him.''

*Cross Complaint.* Also in his answer and by way of cross complaint defendant alleges that he delivered the following mustard seed to plaintiff for sale, viz.:

"October 2, 1947 ........................................................ 22,830 pounds
"January 17, 1947 .................................................... 7,395 pounds
"January 28, 1947 .................................................... 7,620 pounds

                    "Total ................................................ 37,845 pounds"

Further: "That at the time said mustard seed was placed with the defendant the market price was approximately 20¢ per pound and during the month of January, 1947, the defendant went to the plaintiff and told the plaintiff to sell the same on the market and at said time the market price was 17¢, but the defendant refused to purchase the same although at the time said mustard seed would have brought the sum of $6,433.65; and it was expressly understood and agreed between plaintiff and defendant when the mustard seed was put in plaintiff's place of business for storage that the same could be sold by defendant at any time and that plaintiff would pay the prevailing market price but notwithstanding this agreement the plaintiff refused to purchase defendant's mustard to the defendant's damage in the sum of $6,433.65."

Defendant also alleges that again in April 1947 he requested plaintiff to sell the mustard seed on the market when the value thereof was 14¢ per pound or $5,298, but plaintiff refused to purchase the seed or make any effort to sell and persisted in keeping it in storage against defendant's consent, until the market price had gone substantially below the total amount plaintiff had advanced to defendant and that by reason thereof he has been damaged in the sum of $6,433.65 from which sum there should be deducted the total advances made by plaintiff in the amount of $4,700 plus the sum of $360 demanded in plaintiff's first cause of action and the sum of $200 demanded in plaintiff's third cause of action, with interest from the time each advance was made. Defendant's prayer is for judgment against plaintiff in the sum of $1,173.65 and such other relief as the court shall deem just.

The plaintiff replied to the answer and cross complaint, denying all allegations of new matter therein contained and alleged

that the mustard seed was delivered to plaintiff in its capacity as a public warehouseman for storage and not for sale but admitting the seed was sold by plaintiff on August 7, 1950.

Upon these issues the case came on for trial on December 2, 1952, before the district court and a jury.

*Plaintiff's Evidence.* Plaintiff's first witness was the defendant Maurice Britton who produced a letter from plaintiff's counsel bearing date of January 24, 1950, making demand on defendant to forthwith pay the advances so made to him in 1946 and 1947. Defendant also produced a notice from plaintiff bearing date of June 24, 1950, wherein plaintiff again demanded payment of the advances and stated that if same were not paid on or before July 15, 1950, the seed will be advertised for sale and sold at public auction on August 7, 1950. The plaintiff also introduced a copy of the notice of sale to be so held on the date above specified.

Plaintiff's second witness was its managing agent, Edward Crook, who had been in plaintiff's employ from 1943 to 1948. This witness produced the three warehouse receipts, being plaintiff's exhibits 4, 5 and 6, for the seed so delivered to plaintiff by defendant. The witness also produced the checks issued to defendant for the advances made him in 1946 and 1947. The witness was then asked if he remembered that before defendant hauled the seed into plaintiff's elevator defendant had not stated that he did not want to sell the seed that fall because of the income tax, to which the witness replied: "No, I don't believe I remember anything specified as to the time he wanted to sell it." The witness also testified: "Anyone who stored seed then had a right to offer it for sale at any time."

The witness Crook further testified: That he never told defendant his corporation would buy defendant's seed after the first of the year and that the witness could not say whether defendant's seed was placed in a bin with other mustard seed.

Plaintiff's witness Ruben Bortvedt was plaintiff's manager from June 1948 to and including the time of the trial in 1950. Mr. Bortvedt testified that he remembered the sale of defendant's

seed on August 7, 1950; that the seed then brought seven cents per pound; that the reasonable charge for storing mustard seed is two cents per hundred per month and that the witness knew the plaintiff had a lien on the seed to cover all that had been advanced to defendant.

*Nonsuit Denied.* Upon the foregoing evidence the plaintiff rested his case, whereupon defendant interposed a motion for nonsuit which motion was denied.

*Defendant's Evidence.* The defendant Britton, taking the stand as a witness in his own behalf, testified that:

He had been farming near Brady, Montana, since 1927, during which time he had raised considerable mustard seed which he sold and in the fall of 1946 defendant had dealings with the plaintiff's manager Crook.

Defendant further testified:

"I had quite a bit of mustard at home and I didn't want to sell it because my income tax would be too stiff, and I went in and said, 'How about me hauling in some mustard and getting an advance on it and selling it after the first of the year?' He said that I could sell any time I wanted.

"Q. Who are you talking about? A. Mr. Crook.

"Q. The man who testified above? A. Yes. * * *

"Q. Were you interested in hauling mustard in for storage only? A. I had storage at home.

"Q. You had a good safe place? A. Yes.

"Q. What was your purpose in hauling it in? A. To sell it and get rid of it."

Defendant also testified that the market price at that time was 20¢ per pound and he admitted he had received the advances of money as alleged in the complaint which sums had been paid to him as advances for the mustard seed; that he had a second conversation with plaintiff's manager Crook in 1947 shortly after the first of the year when one Reynolds and he went to see Crook; that Reynolds was to get a substantial portion of the money if defendant could sell the mustard seed, as defendant intended to lend Reynolds the money to purchase a tractor

but that at such time plaintiff's manager Crook said, "The market is about seventeen cents, but we can't buy any," and gave as his reason that there was no market.

Defendant further testified that he had other mustard seed at home at that time; that he sold two or three loads of such seed to the Montana Mills at Great Falls in May 1947 for 14¢ a pound; that he raised mustard for two or three years thereafter which he sold for 15¢ per pound; that he never received any notices from plaintiff regarding money for storage; that the only notices he received were the letter of January 24, 1950, from plaintiff's counsel and the notice from plaintiff of June 24, 1950; that defendant never went back to talk to plaintiff's manager after the time in 1947 when defendant had offered to sell plaintiff the seed for 14¢ per pound.

On cross examination defendant testified that he took the advances from plaintiff because he needed the money; that when he tried to sell the seed to plaintiff it would not buy same; that the only times he talked to the plaintiff about selling the seed were in January and in April or May 1947; that after the market price had fallen so that the sale of the seed would only equal the amount owing to plaintiff, the defendant did not care what happened to the seed and that he never asked the plaintiff to re-deliver the seed to him so he could then sell the same to others.

On redirect examination defendant was examined as follows:

"Q. What difference would there be between an advance against mustard and borrowing? A. If I borrowed money I would sign a note and have a due date on it. If you go in and get an advance the minute the grain is sold the advances are all taken out."

J. K. Reynolds, a witness for defendant, testified that he had known defendant for about forty years; that he recalled accompanying defendant to plaintiff's office on January 18, 1947, for the purpose of obtaining some money; that defendant then and there sought to sell his mustard seed so as to lend the proceeds to the witness to enable the witness to buy a tractor. The witness also testified that defendant "wanted to sell the mustard seed for

seventeen cents or whatever the market was, and Mr. Crook said the market was seventeen cents—but for some reason—I couldn't swear what the reason was—seems to me it was something about a shortage of boxcars or something like that. Anyway, the mustard, wasn't sold and I didn't get the money.''

Arthur Lempke, a witness for defendant, testified that he was in the employ of the Montana Flour Mills in Great Falls where his chief business consisted of grading grain and mustard seed and contracting acreage; that he had been engaged in grading grain since 1928 and in grading mustard since 1933; that he engaged in buying mustard seed from farmers, which seed was first placed in a cleaning plant where it was cleaned—then placed in sacks and shipped to customers back east; that his company is perhaps one of the largest in Montana and buys quite a bit of Montana mustard seed on contract. He testified: ''In the spring of the year we get out and contract the acreage with the farmers in northern Montana but we are always ready to purchase any free seed—seed that isn't contracted.'' The witness also testified that he had dealings with the defendant, saying, ''I remember back about three or four years after we started contracting we had contracts with Mr. Britton and bought seed from him.''

The witness Lempke further testified that he had brought with him the records relating to purchase of mustard in the fall of 1946 and the spring of 1947 up to June; that in the beginning of January the price was 17¢ per pound; that it dropped to 15¢ and to 14½¢ in February; that in May it was down to 14¢ per pound; that during those years when the price was way up he had experienced no trouble selling the mustard seed; that the seed was sold to French's,—to the Heinz Pickle Company and to different companies; that from January 1947 to June 1947 his company was buying mustard and selling same; that there was then a ready market as the witness remembers it; that his company handled wheat as well as mustard seed but that the witness is not in the wheat buying business; that the method of buying and selling wheat would apply pretty much to the business of buying mustard seed; that in many cases before buying mustard

seed the buying company would first procure a purchaser for that particular lot of mustard seed; that the buying company in purchasing mustard seed sometimes would also buy the seed outright and then take the chance of selling it on the open market; that if a party comes in and wants to sell ten thousand pounds of Montana seed and he has good number one seed, the company by whom the witness was employed stood ready to buy the seed at the market price which price is usually fixed by the customers back east; that the witness could not say just how Mr. Crook of the plaintiff company could ascertain the market price on mustard seed on January 17, 1947, but "if he was up on the market, and the price was so high like at that time we would readily buy."

On his redirect examination the witness Lempke testified:

"We keep in touch with the buyers back east from day to day.

"Q. So that even if the market price isn't listed in the newspaper if a person is in the mustard business he knows what the market price is from day to day? A. Yes.

On his recross examination the witness Lempke testified:

"We sell mustard seed in carloads, usually about fifteen hundred bushels or seventy-five thousand pounds. Thirty-seven thousand pounds would be half a carload and we sell half lots and one to one company and one to another in the same car. * * *

"Q. You never sold in lots of thirty-seven thousand pounds? A. Not so much in the east but sold some in the northwest and packed half with flour and the other half with mustard."

Again:

"Q. I will ask you whether or not that isn't an essential part of the business of an elevator or a warehouse, to acquire a number of small lots from different people and get it all together in your warehouse and then find a buyer for the whole lot? A. It is an essential part of our business. We like to get as many customers as we can and keep them happy.

"Q. And there would be no reason for Mr. Britton to sell you

a small quantity if he could sell that directly back east? A. That's right.''

*Rebuttal Evidence.* In rebuttal plaintiff recalled the witness Edward Crook who testified that before he could buy the mustard he would have to find a buyer, but not necessarily for that much, but for that quality because it could be pooled with like qualities; that he does not recall the conversation in his place of business at the time Mr. Reynolds was there; that plaintiff had no customer at that time to whom it could sell the mustard seed; that there was no shortage of cars at that time and that he does not recall any conversation with the defendant in April or May 1947. The witness also was asked and he answered:

''Q. What was your practice in the mustard company in regard to selling your patrons out when the price dropped below— A. I don't remember that that was ever done. Not while I was there.''

On his cross examination the witness Crook testified:

''Q. And you held yourself open to business to the public for the purpose of purchasing mustard seed from farmers and for selling it to customers back east, isn't that correct? A. Yes.

''Q. Would you expect a farmer such as my client, Mr. Britton, to deliver his mustard seed to you for the purpose of storage only without any expectation of sale? A. In this particular case it was stored there so that he could sell it after the first of the year for the purpose of income tax. That is his business.

''Q. That was his concern? A. No concern of mine when he sold it.''

The witness Edward Crook further testified that the defendant could just as well have taken his mustard seed down to the Montana Mustard Seed Company, but that plaintiff came to him and wanted his crop; that plaintiff was constantly in contact with people back east in the business of procuring Montana seed; that they were plaintiff's customers as well as of other firms; that it is more convenient for a farmer to bring his mustard seed to an elevator like plaintiff's which can pool with other quantities and sell back east; that processors are not in the habit of

buying directly from the growers and that the witness Crook did not recall the conversation with Mr. Reynolds and defendant in January 1947, or that defendant came back and told the witness to sell the mustard seed, nor does the witness recall any conversation in May when the defendant told him to sell the mustard seed at 14¢ and that defendant never offered to sell the mustard seed at a price at which the witness could buy. The witness then was interrogated and answered as follows:

"Q. You don't remember very much about it is the truth of the matter, isn't it? A. That is right. It is several years."

On his redirect examination the witness Crook testified that defendant never came in and talked about selling his mustard seed at any time when they could agree as to what defendant could get for the seed; that defendant never came in and told the plaintiff to sell the seed for what plaintiff could get for it; that defendant never gave plaintiff any written authority to sell at any time and never tendered plaintiff the money which defendant owed plaintiff..

On his recross examination the witness Crook testified that it is not the custom of the trade to require an order to sell to be put in writing.

In our opinion the foregoing is a fair review of the evidence as it appears in the record now before the court. This somewhat detailed review has been made to illustrate the conflicting and confusing testimony that must be considered in passing on the trial court's rulings on the instructions proposed and given and particularly the instruction directing the jury to return a verdict in favor of the plaintiff on the submitted form.

*Instructed Verdict.* The verdict so rendered at the trial court's direction reads:

"We the Jury in the above entitled action find the issues in favor of the plaintiff and against the defendant and fix plaintiff's damages as follows:

"(a) Upon plaintiff's first cause of action in the sum of $360.00, together with interest thereon at the rate of 6% per annum from July 1, 1947 to December 3, 1952.

"(b) Upon plaintiff's second cause of action in the sum of $3,460.74, together with interest thereon at the rate of 6% per annum from August 7, 1950 to December 3, 1952.

"(c) Upon plaintiff's third cause of action for the sum of $200.00, together with interest thereon at the rate of 6% per annum from June 17, 1950 to December 3, 1952.

"Dated December 3, 1952. C. C. Kellogg, Foreman of the Jury."

On such directed verdict judgment was entered in favor of plaintiff for the sum of $4,649.69 together with interest at the rate of 6% per annum from December 10, 1952, together with plaintiff's costs in the sum of $62.29 and interest thereon at 6% per annum from date until paid.

From the judgment so entered the defendant has taken this appeal.

*Mustard Seed is Grain.* Much of the argument in the briefs of both parties is on the question of whether "mustard seed" is "grain" within the terms of the Montana statutes. The appellant contends that it is grain while the plaintiff contends that it is not grain.

Each of the three warehouse receipts which plaintiff issued upon delivery to it of the seed four times refers to and describes mustard seed as *"grain."*

R. C. M. 1947, sec. 3-218, requires the department of agriculture to adopt a form of receipt for warehousemen. In the absence of competent evidence to the contrary it would seem that the form of the three receipts issued by the plaintiff warehouseman is that prescribed by the commissioner of agriculture as required by the provisions of section 3-218 of the Revised Codes, being a part of the Chapter on Grain Standards. Section 3-201 of the above Chapter does not attempt to name the different kinds of grain but merely says: "Whenever the word 'grain' is mentioned in this act, it shall be construed to include flax." From this it would seem to logically follow, the word "grain" also includes mustard seed. Compare State v. Cowdrey, 79 Minn. 94, 81 N. W. 750, 751, 48 L. R. A. 92; also 38 C. J. S., Grain, page 975.

Should there be any doubt about the general term "grain" including "mustard seed" such doubt is removed by the provisions of section 3-801, subd. 1, of the Revised Code of Montana of 1947, being a part of chapter 8 on agricultural seeds, which provides: "The term 'agricultural seeds' or 'agricultural seed' shall include * * * the cereals, such as wheat, oats, barley, rye, corn, and hybrid corn; and miscellaneous crops such as rape, buckwheat, millet, sorghums, *mustard*, flax; together with seeds of any other crops that may be raised as field crops in Montana, when such are sold, offered, or exposed for sale within this state, country or territory, for seeding purposes within this state." Emphasis supplied.

R. C. M. 1947, sec. 3-110, enacted in 1921 and amended by Chapter 88, Laws of 1939, provides that the department of agriculture shall enforce the provisions of section 3-801, supra, also amended by said Chapter 88, Laws of 1939, and for that purpose shall make proper rules and regulations.

Appellant's brief states that in the regulations issued by the department of agriculture, mustard seed is classified as "grain" when warehoused or marketed commercially and in its answer brief respondent states that "the attempt of said Commissioner to classify mustard seed as grain is neither a regulation nor a rule."

The law presumes that the commissioner of agriculture performed his official duty, R. C. M. 1947, sec. 93-1301-7, subd. 15 and 33; Doney v. Northern Pacific R. Co., 60 Mont. 209, 229, 199 Pac. 432, as required by section 3-218, supra, and that the form of warehouse receipt used and issued by plaintiff is in the form prescribed by law and the rules and regulations of the commissioner of agriculture of which law and official acts this court may take judicial notice. R. C. M. 1947, sec. 93-501-1, subd. 3. Compare Coen v. Denver Mutual Fire Ins. Co., 155 Ill. App. 332.

But, says respondent, the department of agriculture had no authority to classify mustard seed as grain, citing the case of House v. Chicago & N. W. R. Co., 30 S. D. 321, 138 N. W. 809, Ann. Cas. 1915C, 1045, in support of its contention but that case

is clearly distinguishable in that it did not construe statutes worded like R. C. M. 1947, sections 3-110, 3-218 and 3-801.

This court holds that mustard seed is a grain, R. C. M. 1947, ▮ sec. 3-801, and that the provisions of R. C. M. 1947, sections 3-223 and 3-224, are here applicable.

R. C. M. 1947, sec. 3-223, provides: *"Date of termination of storage contracts evidenced by warehouse receipts.* All storage contracts on grain in store in public local grain warehouses, as evidenced by a warehouse receipt, shall terminate on June 30th of each year."

R. C. M. 1947, sec. 3-224, provides: *"Termination of storage contract—sale of grain for charges.* Storage on any or all grain may be terminated by the owner at any time before the date mentioned herein by the payment or tender of all legal charges and the surrender of the storage receipt, together with a demand for delivery of such grain, or notice to warehouseman to sell the same. In the absence of a demand for delivery, order to sell, or mutual agreement for the renewal of the storage contract entered into prior to the expiration of the storage contract, as prescribed in this act, the warehouseman shall, upon the expiration of the storage contract, sell so much of such stored grain at the local market price on the close of business on said day as is sufficient to pay the accrued storage charges, and shall thereupon issue new storage tickets for the balance of the grain to the owner thereof upon surrender by him of the original storage receipts. Provided, further, that it shall be the duty of the warehouseman on the first day of June of each year to notice all storage ticket holders at their last known address of the provisions of this act."

The record fails to show any compliance or attempt by plaintiff to comply with the provisions of sections 3-223 and 3-224, supra.

The evidence clearly shows that plaintiff held defendant's grain in storage until 1950 during which time the market value of mustard seed had dropped from 17¢ to 7¢ per pound, and that on June 24, 1950, plaintiff first made demand for the storage charges due and thereafter sold the seed at public auction on

August 7, 1950, all of which was in violation of the plain provisions of sections 3-223 and 3-224, supra.

Due to depression in market price the sale then brought $3,460.74 less than the total advances made by plaintiff to defendant plus interest thereon.

At the close of the evidence the defendant offered and requested the court to give certain instructions to the jury including defendant's offered instructions No. 5 and No. 7, which instructions the trial court rejected and declined to give. While the two offered instructions would have been proper had the case been submitted to the jury for its determination yet prejudicial error may not be predicated upon the failure to give them at the trial had wherein the verdict was directed by the trial judge.

There are many conflicts in the evidence in the instant case. Such conflicts must be resolved by the jury and not by the trial judge. In directing the verdict for plaintiff on such conflicting evidence the trial court invaded the province of the jury, —disregarded the provisions of R. C. M. 1947, sec. 93-4905, and committed reversible error. See also State ex rel. Carlin v. District Court, 118 Mont. 127, 132, 164 Pac. (2d) 155.

Under the controlling statutes and the evidence introduced it was error for the trial court to instruct the jury to return its verdict for plaintiff and against defendant. The judgment entered on such directed verdict is reversed and the cause is remanded for a trial by a jury under proper instructions.

MR. JUSTICES ANGSTMAN, ANDERSON and BOTTOMLY, concur.

MR. JUSTICE DAVIS did not participate.